**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| RUBIO'S RESTAURANTS, INC., *et al.*, | Case No. 20-12688 (___) |
| Debtors. [1] | (Joint Administration Requested) |

**DECLARATION OF MELISSA S. KIBLER,**
**CHIEF RESTRUCTURING OFFICER OF THE DEBTORS,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Melissa S. Kibler, hereby declare under penalty of perjury:

1.    I am the Chief Restructuring Officer ("CRO") of Rubio's Restaurants, Inc. ("RRI") and each of its affiliated debtors and debtors in possession (collectively with RRI, "Rubio's" or the "Debtors", and each individually a "Debtor") in the above-captioned chapter 11 cases (these "Chapter 11 Cases"). I am a Senior Managing Director at Mackinac Partners LLC ("Mackinac"), a financial advisory firm that provides, among other things, restructuring and turnaround management services.

2.    I have approximately thirty (30) years of experience providing financial advisory, restructuring and turnaround services and have advised companies, lenders, creditors, corporate boards and equity sponsors across a diverse range of industries both domestically and internationally. I have assisted clients both inside and outside of chapter 11 in addressing a variety of financial, accounting, operational, liquidity, and leverage issues. I have served as the CRO in the recent bankruptcy of Juno USA, previously the third-largest ride-hailing company in New

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Rubio's Restaurants, Inc. (0303); MRRC Hold Co. (1242); Rubio's Restaurants of Nevada, Inc. (7609); and Rubio's Incentives, LLC. (9359). The Debtors' mailing address is 2200 Faraday Avenue, Suite 250, Carlsbad, CA 92008.

York, and as the Chief Financial Officer of Edmentum, a leading provider of K-12 online learning solutions. I also have served as financial advisor in restructurings or restructuring-related litigation for debtors and companies in matters such as Delta Career Education Corp. (acquirer), Tronox, Sprint, North Pacific Group, Havens Steel, Avcraft, Alterra, Archdiocese of Portland, Assisted Living Concepts, BMK, Physician Partners and Iridium; the examiner, trustee or receiver in matters including Residential Capital, Calumet, Sentinel Management Group and Capital Consultants; creditors or official committees in cases such as Energy Future Holdings, Savient, Neff, Chrysler, Quebecor, Engineered Plastic Products, Kmart, Bethlehem Steel, LTV Steel, Warnaco Group and Singer; and other stakeholders in matters including FirstMed EMS, Keywell, International Offshore Services, ASARCO, Amaranth, Mervyn's and Enron, as well as many confidential and out-of-court matters.

3.      On May 28, 2020, Mackinac was retained by the Debtors as restructuring financial advisor to provide certain advisory services in connection with the Debtors' ongoing evaluation, development and implementation of strategic alternatives to address their financial performance and capital structure. Since then my team has provided strategic and financial advisory services to the Debtors' management team ("Management") in concert with the other advisors retained by the Debtors in connection with preparing for these Chapter 11 Cases. On October 23, 2020, I was appointed as CRO of the Debtors.

4.      Substantially contemporaneous with the filing of this declaration (this "Declaration"), each of the Debtors filed a voluntary petition (collectively, the "Petitions") in the United States Bankruptcy Court for the District of Delaware (this "Court") for relief under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code"). To minimize the potential adverse impact of the commencement of these Chapter 11 Cases, the

Debtors have requested certain "first day" relief in various applications and motions filed with the Court, each of which is listed in Section V(A) below (collectively, the "First Day Motions").  The First Day Motions seek relief intended to preserve the value of the Debtors by, among other things, satisfying certain prepetition claims and granting certain administrative and procedural relief to facilitate an orderly transition into and out of these Chapter 11 Cases.  This relief is critical to the Debtors' restructuring and reorganization efforts.

5.      As a result of my work as an advisor to the Debtors, my review of relevant documents, and my discussions with other members of Management and the other advisors to the Debtors, I am familiar with the Debtors' day-to-day operations, business affairs and books and records and the Debtors' restructuring objectives.  I submit this Declaration in support of the Petitions and the First Day Motions and to assist the Court and other parties in interest in understanding the Debtors' corporate history, business operations and prepetition capital structure and the circumstances that compelled the commencement of these Chapter 11 Cases as of the date hereof (the "Petition Date"). To that end, this Declaration begins with an Overview of the Debtors' current situation and then contains the following five parts.  *Part I* provides background on the Debtors' corporate history and operations.  *Part II* provides an overview of the Debtors' prepetition capital structure.  *Part III* describes the circumstances leading to the filing of these Chapter 11 Cases.  *Part IV* provides an overview of the proposed Prepackaged Plan and Postpetition Financing (each as defined below). *Part V* provides the factual basis for the relief requested in the First Day Motions.

6.      Except as otherwise indicated, all facts or opinions set forth in this Declaration are based upon my personal knowledge, my discussions with members of Management and the Debtors' advisors, my review of relevant documents and information concerning the Debtors'

financial affairs and restructuring initiatives or my experience.  I am authorized to submit this Declaration on behalf of the Debtors.  If called upon as a witness, I could and would testify competently to the statements set forth in this Declaration, as the information in this Declaration is accurate to the best of my knowledge.

## OVERVIEW

7.        The Debtors are operators and franchisors of approximately 170 limited service restaurants in California, Arizona and Nevada under the Rubio's Coastal Grill concept.  As is the case with nearly every other restaurant chain in the country, if not the world, the Debtors have spent the last eight months navigating the challenges imposed by the COVID-19 pandemic.

8.        In response to the pandemic and changes in customer dining patterns, both related to and accelerated by the pandemic, the Debtors temporarily shut stores or reduced store hours to match customer demand and closed many underperforming stores on permanent basis.  As a result, the Debtors laid off and furloughed numerous employees.  Additionally, the Debtors were called upon to address increased costs related to implementing new health and safety measures, and the expansion of support for delivery and take-out services further impacted margins during this period.

9.        To address the Debtors' cash needs, through the spring and summer months, the Debtors sought concessions from landlords and in certain instances stopped paying rent to conserve cash.  Between May and June 2020, the Debtors elected not to reopen twenty-six (26) stores with unsustainable operating losses and/or other significant challenges across California, Arizona, Colorado and Florida.  The permanently closed stores included all of the Debtors' locations in Colorado and Florida, markets where the Debtors had yet to achieve penetration and brand recognition on par with their core geographies.  The closure of these markets and the other

underperforming stores enabled the Debtors to achieve distribution cost efficiencies, reduce operating losses and decrease general and administrative expenses.

10.     The Debtors also applied for and received a $10.0 million loan (the "PPP Loan") under the Paycheck Protection Program, administered by the Small Business Administration under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, which the Debtors used to fund payroll.  The Debtors have requested 100% forgiveness of the PPP Loan.

11.     Unfortunately, these and the other measures taken by Management to cut costs, drive sales and win new customers proved insufficient in the face of the Debtors' dwindling cash position, and in June 2020, the Debtors received a notice of default and reservation of rights from the lenders (the "Prepetition Secured Lenders") under their prepetition secured credit facility (the "Prepetition Credit Facility").[2]  Since then, the Debtors have been in negotiations with the Prepetition Secured Lenders and Mill Road Capital, L.P. (the "Investor") regarding a restructuring of their balance sheet and a right sizing of their operational footprint.  While negotiations were progressing, in late September, the Prepetition Secured Lenders initiated a $6.5 million cash sweep of the Debtors' main cash concentration account, which would have deprived the Debtors of much needed cash for the month of October.  In response, and to preserve the cash necessary to bridge to a restructuring, the Debtors negotiated a pay down of their revolving credit facility in the amount of approximately $4.6 million (exclusive of related fees), which the Debtors believed would provide sufficient liquidity to conclude negotiations regarding the proposed prepackaged consensual restructuring that the Debtors now seek to implement through these Chapter 11 Cases. Further, the Debtors negotiated and reached an agreement with Golub Capital Markets LLC (f/k/a

---

[2]     The Notice of Default and Reservation of Rights dated June 25, 2020 referenced certain Events of Default existing as of March 31, 2020 in connection with the delivery of the Debtors' first quarter compliance package, including with respect to the Debtors' fixed charge coverage, total leverage and lease adjusted leverage ratios.

27242754.1

GCI Capital Markets LLC) ("Golub") on the terms of debtor in possession financing to be provided by certain of the Prepetition Secured Lenders in the aggregate amount of up to $8.0 million in term loan commitments to fund the Debtors' operations through the pendency of these Chapter 11 Cases. Last, the Debtors also agreed to the terms of an equity investment by the Investor to provide additional liquidity to the reorganized Debtors immediately upon the consummation of a chapter 11 plan of reorganization. These negotiations resulted in the preparation of the pre-packaged chapter 11 plan of reorganization (the "Prepackaged Plan") on which the acceptances of the Prepetition Secured Lenders were solicited and received immediately prior to the commencement of these Chapter 11 Cases.

12.     Thus, the Debtors filed these Chapter 11 Cases to implement the terms of the Prepackaged Plan and the go-forward business plan on which the Prepackaged Plan is based. In that regard, these Chapter 11 Cases will enable the Debtors to (i) reduce the Debtors' secured indebtedness on a consensual basis, (ii) address their operational footprint by rejecting leases on locations already closed, assessing geographical markets in which margins and go-forward viability are questionable, and negotiating go-forward rental rates that are more in line with current markets, and (iii) provide the Debtors with a significant liquidity infusion upon emergence. Consequently, the Prepackaged Plan has been accepted by the Prepetition Secured Lenders, and is supported by Management and the Investor.

## I.     THE DEBTORS' CORPORATE HISTORY

13.     Ralph Rubio co-founded Rubio's in 1983 after repeated trips to Mexico as a college student, where he discovered the fish taco and transcribed a batter recipe that he carried around on a piece of paper along with the combination for his bike lock for eight years. The first Rubio's

location was a walk-up stand in Mission Bay, San Diego.  There, countless Americans tasted their

first fish tacos and, like Ralph, were soon hooked.



The first Rubio's location, which opened in January 1983 on East Mission Bay Drive.



The grand opening of the third Rubio's location in Pacific Beach in 1986.

14.     As word of Ralph's fish tacos spread, so did his business.  One restaurant quickly

expanded to three, and before long, San Diego's best-kept secret was out.  The Rubio's fish taco

phenomenon and The Original Fish Taco® recipe spread far beyond San Diego, along with

Ralph's commitment to fresh and high quality ingredients that is still a hallmark of Rubio's today.

A visit to Rubio's for a fish taco appears regularly on published bucket lists and "must dos" while

visiting San Diego.

15.     After tremendous growth in the late 1980s and 1990s, Rubio's completed an initial

public offering in May 1999, trading on the NASDAQ National Exchange under the ticker symbol

"RUBO."  Ralph stepped down as CEO in 2001 but remained actively involved as head of the

culinary team, co-founder and Chairman.  In 2010, the Investor acquired Rubio's in a "take-

private" transaction for $91 million.[3]

---

[3]   The Investor acquired all outstanding shares of RRI in a cash merger transaction through the Investor's wholly owned subsidiary MRRC Hold Co.  Pursuant to that certain Agreement and Plan of Merger dated as of May 9, 2010, as amended, modified, supplemented and restated from time to time, MRRC Hold Co.'s wholly-owned subsidiary MRRC Merger Co. ("Merger Sub") was merged with and into RRI and, as a consequence, the separate

27242754.1



Rubio's Coastal Grill concept and store design, which launched in 2016.

16.    Over the years, the Rubio's brand concept evolved as the Debtors matured and sought to appeal to an ever-broader customer base within the "quick-casual" segment of the restaurant industry.  The original restaurant concept, "Rubio's, Home of the Fish Taco," became "Rubio's Baja Grill" in 1997, and was changed again to "Rubio's Fresh Mexican Grill" in 2002.  Most recently, in 2014, the Debtors adopted the "Rubio's Coastal Grill" concept and revamped the design of their logo and stores in connection with further expansion efforts.

17.    Today, Rubio's operates 167 company-owned restaurants and has three franchised restaurants across California, Arizona and Nevada, serving an array of one-of-a-kind recipes focusing on grilled seafood, tacos, and bowls.  The Debtors offer limited-service in-store dining

---

existence of Merger Sub ceased and RRI continued as the surviving corporation of the merger and as a wholly-owned subsidiary of MRRC Hold Co.

(*i.e.*, customers order and pay at a counter and the food is brought to their table), take-out at all restaurant locations, and delivery from all restaurant locations through partnerships with the highest ranked third party delivery companies, including DoorDash, Grub Hub, Uber Eats and Post Mates.  The Debtors employ more than 3,400[4] hourly and salaried employees at their restaurants and corporate offices located in Carlsbad, California.

18.     The Debtors' commitment to their brand and core mission—delivering (i) freshly prepared high quality food with bold, distinctive tastes and flavors, (ii) a casual, fun dining experience and (iii) excellent dining value—has resulted in continued annual recognition awarded by various associations as one of the strongest brands in the industry and geographies where it operates.  In 2015, Rubio's topped a Consumer Reports survey that asked over 32,000 readers to name their favorite Mexican fast food chain—ahead of much bigger, nationwide concepts, such as Chipotle and Taco Bell.  In 2016, the city of San Diego declared April 5th "Ralph Rubio Day" in honor of "the taco king," as Ralph Rubio had become known in San Diego.  And, in August of this year, the San Diego Tribune named Rubio's "best fish taco"—for the seventh year straight.[5]

## II.     PREPETITION CORPORATE AND CAPITAL STRUCTURE

19.     As of the Petition Date, the Debtors have approximately $82.3 million of outstanding funded debt obligations (exclusive of accrued interest and fees).  The following charts depict the Debtors' corporate and capital structure:

---

[4]     The Debtors currently employ approximately 3,400 active employees with 104 employees on furlough.

[5]     *See* San Diego's Best Fish Taco, SAN DIEGO UNION TRIBUNE (Aug. 31, 2020), https://www.sandiegouniontribune.com/bestoffersd/story/2020-08-31/san-diegos-best-restaurants-2020.



PREPETITION CORPORATE STRUCTURE WITH DEBT OVERLAY

PREPETITION CAPITAL STRUCTURE DETAIL – FUNDED DEBT

| Type of Debt | Description | Maturity | Approximate Principal Amount Outstanding * |
|---|---|---|---|
| **Revolving Credit Facility** | $8.0 million revolving credit facility secured on a first lien basis by substantially all assets of RRI and each of the other Debtors, except to the extent such assets are considered excluded assets under the applicable loan and collateral documents | April 2021 | $4.0 million |
| **Term Loan Facility** | Term loan credit facility secured on a first lien basis by substantially all assets of RRI and each of the other Debtors, except to the extent such assets are considered excluded assets under the applicable loan and collateral documents | April 2021 | $68.3 million |
| **Total Secured Debt** | | | **$72.3 million** |
| **PPP Loan** | Unsecured term loan, issued pursuant to the CARES Act; The Debtors have requested 100% forgiveness based on satisfaction of certain employee retention metrics under the loan terms | April 2022 | $10.0 million |
| **Total Funded Debt** | | | **$82.3 million** |

\* Includes capitalized payment-in-kind (PIK) interest and fees; excludes accrued interest.

## A.    PREPETITION CREDIT FACILITY

20.    On August 24, 2010, the Debtors entered into the Prepetition Credit Facility pursuant to that certain Credit Agreement (as amended, restated, supplemented, amended and restated or otherwise modified from time to time, the "Prepetition Credit Agreement") by and

among RRI, successor-by-merger to MRRC Merger Co., as borrower, each other loan party thereto (the "Loan Parties"), Golub, as administrative agent (the "Prepetition Agent"), and the Prepetition Secured Lenders[6] (together with the Prepetition Agent, the "Prepetition Secured Parties").  The Prepetition Credit Agreement governs both a senior secured term loan credit facility (the Term Loan Facility") and senior secured revolving credit facility[7] (the "Revolving Credit Facility").  The Term Loan Facility and the Revolving Credit Facility are *pari passu* with respect to collateral, although the Revolving Credit Facility has payment priority relative to the Term Loan Facility. Each of the other Debtors are guarantors of the Prepetition Credit Facility.

### 1. Revolving Credit Facility

21.    The Revolving Credit Facility was originally issued in an aggregate principal amount of $5.0 million (subsequently increased to $10.0 million and later reduced to $8.0 million, as of December 31, 2018) and has a maturity date of April 30, 2021.  Interest on the Revolving Credit Facility accrues at LIBOR plus an applicable margin of 7.50%.   Additional payment-in-kind (PIK) interest accrues to the principal balance at a rate of 4.00%.  As of the Petition Date, approximately $4.0 million principal amount (including capitalized PIK interest and fees) and $21,900 in accrued interest remain outstanding on the Revolving Credit Facility.

### 2. Term Loan Facility

22.    The Term Loan Facility (the loans issued thereunder, the "Term Loans") was originally issued in an aggregate principal amount of $41.1 million.  Since then, the lenders under the Prepetition Credit Facility have made additional Term Loans to the Debtors in an aggregate amount equal to $25.0 million.  Interest on the Term Loan Facility accrues at LIBOR plus an

---

[6]    The Prepetition Secured Lenders are all Golub affiliates.

[7]    The Revolving Credit Facility includes a sub-limit for Letters of Credit (as defined therein).

applicable margin of 7.50%. Additional payment-in-kind (PIK) interest accrues to the principal balance at a rate of 4.00%. As of the Petition Date, approximately $68.2 million principal amount (including capitalized PIK interest and fees) and $768,600 in accrued interest and other fees remain outstanding on the Term Loan Facility. The Term Loan Facility has a maturity date of April 30, 2021.

### 3. Prepetition Liens and Prepetition Collateral

23.     The Debtors' (each, a "<u>Grantor</u>" and together, the "<u>Grantors</u>") obligations under the Prepetition Credit Agreement are secured (i) by a continuing first-priority lien and security interest in and Lien[8] on each of the Grantors' right, title and interest in and to substantially all of the property and assets of such Grantor (which, for the avoidance of doubt, includes Cash Collateral), and the proceeds thereof, whether now owned or existing or hereafter acquired or arising, regardless of where located; (ii) by a grant to the Prepetition Agent for the benefit of itself and the other Prepetition Secured Parties, of all of Rubio's Restaurants, Inc.'s presently existing or hereafter acquired right, title and interest in and to the Trademarks[9] and all proceeds and products thereof, and (c) Rubio's Restaurants, Inc.'s pledge, assignment, hypothecation, transfer, delivery and grant to the Prepetition Agent, for the benefit of itself and the other Prepetition Secured Parties, a lien on and security interest in the Pledged Collateral,[10] whether now existing or hereafter acquired, and whether consisting of investment property, accounts, payment intangibles or other general intangibles, or proceeds of any of the foregoing.

---

[8]    As defined in that certain Security Agreement, dated as of August 24, 2010 (as amended, restated, supplemented, amended and restated or otherwise modified from time to time).

[9]    As defined in that certain Trademark Security Agreement, dated as of August 14, 2010 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

[10]    As defined in that certain Pledge Agreement, dated as of August 24, 2010 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

24.     The Prepetition Secured Parties' security interests in the Debtors' deposit accounts are perfected by control.  A deposit account control agreement ("DACA") is in place between the Loan Parties, the Prepetition Agent, and JPMorgan Chase Bank, N.A.  relating to certain of the Debtors' accounts.  The Loan Parties also have a deposit account with Sunwest Bank, which held the proceeds of the loans issued under the PPP Loan Agreement (defined below), and another account with JPMorgan Chase Bank, N.A. that is used to for payroll disbursements.  Neither of these accounts is covered by an existing DACA.

## B.     PPP LOAN

25.     On April 14, 2020, the Debtors entered into the PPP Loan pursuant to that certain unsecured loan agreement by and among RRI, as borrower, and Sunwest Bank, as lender (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "PPP Loan Agreement").  As of the Petition Date, $10.0 million principal amount remains outstanding under the PPP Loan Agreement.  Pursuant to its terms, the PPP Loan is forgivable to the extent the Debtors can demonstrate compliance with certain requirements on the use of the funds and employee retention metrics.  On October 6, 2020, the Debtors submitted a request for 100% loan forgiveness based on the satisfaction of these requirements and metrics.

## C.     EQUITY INTERESTS IN MRRC HOLD CO., INC

26.     As of the Petition Date, MRRC Hold Co. ("MRRC") has 541 shares of common stock outstanding.  The Investor holds one share, and former members of Management hold the remainder.  MRRC has 122,746 shares of preferred stock outstanding.  The Investor holds approximately 92.00%, Golub-managed funds hold approximately 5.00%, and current and former members of Management hold the remainder.

27242754.1

III.    **CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES**

A.    **SECULAR TRENDS AND RECENT HEADWINDS**

27.    The Debtors operate in the ultra-competitive fast casual dining sector, competing with everything from national and multi-state chains, to local chains and individual restaurants. The fast casual model is expected to continue to grow relative to other food service models. However, the Debtors have had to increase spending to compete effectively and maintain the Rubio's customer base in light of the expansion of existing fast casual competitors, the launch of new formats and operators, and the deployment of new technologies to reach and engage customers.

**1.    Increased Competition from Adjacent Restaurant Formats and Saturation of the Fast-Casual Market**

28.    Fast casual dining first became popular in the 1990s.  With the maturation and success of the fast casual model, many casual dining and fast food restaurants have shifted toward the fast casual model to win back customers.  Such restaurants have introduced better, healthier and more sustainable ingredients, and new customer interaction technologies, ultimately blurring the distinctions between service models.  Fast casual chains themselves pursued aggressive expansion in urban centers where many early fast casual concepts were introduced, as well as in suburban and other areas.  This all led to increased competition for customers, particularly during the lunch daypart, which had a direct impact on growth of the fast casual segment.[11]

**2.    Increased Emphasis On Off-Premises Dining**

29.    The past decade has seen incredible growth in food delivery.  Customers can easily order a wide variety of food online or from mobile devices and have it delivered to their home or

---

[11]    Whereas the fast-casual sector saw sales growth between 10% and 11% from 2010–2015, sales growth has slowed to 6% to 7% in recent years. *See* "The State of the Fast-Casual Industry," QSR Magazine (Dec. 12, 2019), available at https://www.qsrmagazine.com/exclusives/state-fast-casual-industry.

workplace within a short time span.  Digital ordering and delivery, including through third party delivery services, has grown 300% faster than dine-in traffic since 2014.[12]  This trend is especially prevalent among millennials, who are more likely to order takeout or delivery than dine in-store.[13]  The Debtors' introduction of digital ordering and delivery services has amplified their ability to reach customers, but the Debtors' reliance on third party dispatch and delivery platforms has impacted margins[14] and may reduce customer loyalty over the longer term by lowering switching costs.  As such, and because the in-store experience features less prominently today in the overall customer value proposition, the Debtors must work harder and more creatively to differentiate their offerings from the competition.

### 3.    Minimum Wage Increases

30.    Minimum wage increases in many of the Debtors' key markets, especially in California, have impacted margins and are expected to continue to impact margins through 2022, the date of the last scheduled increase.  To partially mitigate the compression impact of the annual increases in minimum wage, prior to the COVID-19 pandemic, the Debtors introduced a tip program in which all employees in the service chain participate.  As of September 2020, the impact on average wage for the average employee has been an addition of approximately $1.70 per hour.  The Debtors believe that this program will make the Debtors a more competitive employer.

---

[12]    Resendes, Stephanie, "31 Online Ordering Statistics Every Restauranteur Should Know in 2020", Upserve.com (Jun. 11, 2020), available at https://upserve.com/restaurant-insider/online-ordering-statistics/.

[13]    *Id.*

[14]    The Debtors began subsidizing administrative and delivery fees to maintain market share as they were building their digital presence and, as discussed further below, have increased subsidies during the pandemic to offer reduced-cost or free delivery to their customers in line with competitors.

### 4. Other Labor Matters

31.     From 2012 to 2016, the Debtors enjoyed significant year-on-year sales and EBITDA growth almost entirely on a same store basis.  Then, in mid-2017, as the result of a new IRS rule related to the Affordable Care Act, the Debtors were forced to terminate certain employees, including over 30% of their line chefs (the most important crew position in their restaurants), with an average of nine and one half (9.5) years of experience with the Debtors.[15] Training the less experienced workers hired to replace them diverted critical resources, including Management's time.  New store openings in Northern California and Florida suffered as a result. The transition required the Debtors to reduce store hours in the tightest labor markets and resulted in reduced employee oversight.  The Debtors suffered a period of poor service and customer complaints, reflected in the Debtors' year-end overall customer satisfaction ("OSAT") scores in all key areas, including speed of service and accuracy of orders.  Meanwhile, increased hourly employee costs due to a tight labor market and steady increases to the minimum wage in California also impacted margins.[16]  In the second half of 2017 and into 2018, the Debtors' revenues and EBITDA declined, with same store sales also declining.

---

[15]    The Internal Revenue Service rule (the "IIM Rule") mandated verification of all employee Social Security Numbers ("SSN") to ensure compliance with the individual insurance mandate under the Affordable Care Act. In 2012, Rubio's had adopted the federal E-Verify system for all newly hired employees to ensure that new employees were authorized to work in the United States.  Regulations prohibited Rubio's from using E-Verify or any other means to check the immigration status of existing employees that had previously been hired using the traditional I-9 process in compliance with requirements at that time.  When the IIM Rule took effect in 2017, Rubio's identified 341 employees without valid SSNs, which it terminated.

[16]    After a period of no wage increases since 2014, on January 1, 2016, the hourly minimum wage in California increased from $9.00 to $10.00.  It increased again on January 1, 2017 to $10.50, on January 1, 2018 to $11.00, on January 1, 2019 to $12.00, and on January 1, 2020 to $13.00.  *See* "History of California Minimum Wage," State of California Department of Industrial Relations, https://www.dir.ca.gov/iwc/minimumwagehistory.htm (last accessed October 24, 2020).

### B.  PRE-COVID TURNAROUND EFFORTS

32.  Between 2018 and 2020, Management launched a series of initiatives to respond to these challenges.  Management rebuilt the Debtors' employee base and, in the process, improved hiring, training and oversight practices.  Beginning in 2019, Rubio's began investing in a more "frictionless" guest experience in line with customer demand.  Rubio's relaunched its website, introduced a new online ordering system and Rubio's branded delivery program, launched a mobile-app based loyalty program,[17] expanded service options by partnering with additional third-party online ordering and delivery partners, and significantly enhanced data and analytics-driven marketing initiatives.  Rubio's also shifted the focus of its messaging to the "health benefits" and "adventurous bold flavors" of wild-caught seafood.  Through its mobile-app based loyalty program, Rubio's began encouraging customers to eat seafood "Twice a Week."  Separately, Management drove significant cost savings in procurement and other areas that improved overall profitability.

33.  As a result of these efforts, the Debtors' year-end OSAT scores improved from a low of 66.4 at year end 2017 to a best-in-class 72.4 at year end 2019.  Same store sales in 2019 grew 2.4% after two years of break-even or declining sales.

34.  Given the Debtors' improved outlook, Management prepared to launch a sale process in February/March 2020.  The Debtors retained investment bank Duff & Phelps to drive this process, but the COVID-19 pandemic interrupted the Debtors' efforts before Management and their advisors had reached out to any potential buyers, forcing the Debtors to suspend the process.

---

[17]  Within three months of launch, the program attracted over 220,000 members; current membership exceeds 320,000 and the Debtors have observed incremental transaction volume among participating customers.

## C.    COVID-19 PANDEMIC AND RELATED RESTRICTIONS

35.    Despite Management's success in restoring OSAT scores and rebuilding the Debtors' customer base, the unprecedented scale of the COVID-19 pandemic and the severity of its impact on customer demand and store operations were unforeseeable circumstances.  As various federal, state and local governments instituted shelter-in-place mandates and limited restaurants to delivery and takeout services, [18] the Debtors (like many other restaurants) experienced a significant decline in customer spending and foot traffic.  Meanwhile, the Debtors were forced to adopt an entirely new set of operational requirements (and incur related costs) to protect the health and safety of their customers, employees and supplier partners.  Management could not have predicted the scope, scale and impact of the government-ordered shutdowns, which effectively altered the viability of the Debtors' business model overnight.   Given that on-premises dining had traditionally accounted for approximately 47% of the Debtors' sales, the shutdowns delivered a sudden and significant blow to the Debtors' liquidity position.[19]  The Debtors' projections demonstrated that, to weather this environment, the Debtors needed to take immediate action to

---

[18]    *See, e.g.,* Ariz. Exec. Order 2020-47 (Jul. 9, 2020) (directing restaurants to limit indoor dining at 50% capacity and maintain at least six feet of separation between parties or groups at different tables, booths or bar tops, unless the tables are separated by glass or plexiglass; directing restaurants to eliminate indoor standing room where patrons can congregate); Cal. Guidance on Closure of Sectors in Response to COVID-19 (Jul. 1, 2020) (directing restaurants in counties that have been on the state's county monitoring list based on transmission data for three consecutive days to close indoor operations for a minimum of three weeks); Cal. Exec. Order N-60-20 (May 4, 2020) (informed local health jurisdictions and industry sectors that they may gradually reopen under new modifications and guidance provided by the state of California); May 7, 2020 Public Health Order; Cal Exec. Order N-33-20 (Mar. 19, 2020) (directing residents to stay at home except as needed to maintain continuity of operation of critical infrastructure sectors); Nev. Exec. Order, Declaration of Emergency, Directive 021: Phase Two Reopening Plan (May 28, 2020) (directing restaurants and food establishments to limit capacity to 50% occupancy); Nev. Exec. Order, Declaration of Emergency, Directive 024 (extending Phase Two Reopening Plan to July 31, 2020).

[19]    By the second week of April, weekly same store sales had declined by more than approximately 65% from the same period in 2019. Same store sales for units that the Debtors were able to keep open have since recovered but were still below 2019 levels at approximately negative 6.5% to date in October. In terms of cash flow, the Debtors generated positive operating cash flow of $3.3 million in the first two months of 2020. However, from April through September 2020, operating cash flow was approximately negative $2.1 million, despite the Debtors not paying $6.6 million in rent obligations during this period.

preserve liquidity, significantly de-lever their capital structure, and right-size their restaurant lease portfolio to more appropriately match customer demand.

### D.    MANAGEMENT'S STRATEGIC RESPONSE

36.    Over the past eight months, Management and employees have demonstrated their ability to persevere despite unprecedented shutdowns and their impact on the Debtors' economic prospects.  Beginning in late February 2020, the Debtors implemented aggressive measures to minimize the risk of transmission at their stores through enhanced cleaning protocols, distancing requirements and the use of protective equipment in kitchens, at pick-up counters, in dining rooms (to the extent they remained open), around the store premises generally, and in preparing food for pick-up and delivery.[20]  The safety of employees and guests is critical to the Debtors, who have sought to meet or exceed all local COVID-19 and health regulations in the operation of their stores.

37.    Then, in mid-March 2020, as states began to issue stay-at-home orders, social distancing protocols and restrictions that forced the Debtors to temporarily close restaurants for on-premises dining, Management quickly mobilized to serve the Debtors' customers within these new operating constraints.[21]  The Debtors rapidly transitioned from an operating model based on a mix of limited-service in-store dining, takeout and delivery to an operating model based solely on takeout and delivery or to a delivery-only operating model.  In the process, Management navigated dozens of unique and changing sets of federal, state and local government operational rules,

---

[20]    In early May 2020, in recognition of the Debtors' practices, the Debtors' Chief Executive Officer was asked to participate in a small group advising California Governor Newsom regarding pandemic-related industry issues. The Debtors expect that their expanded offerings and new safety and sanitation practices, implemented in response to the COVID-19 pandemic, will help attract and retain customers and enhance employee retention as economies reopen more fully and even after the immediate impact of COVID-19 recedes.

[21]    As of early October 2020, thirty-one (31) of the company-owned stores operated at 50% dine-in capacity, ninety-six (96) operated at 25% dine-in capacity and twenty-nine (29) remained open but prohibited from offering dine-in service by state mandate; eleven (11) of the company-owned stores remained temporarily closed. Restrictions are again increasing as a result of worsening COVID-19 infection rates, including in areas where the Debtors operate.

guidelines and mandates. The Debtors also applied for and obtained the PPP Loan, which avoided

a liquidity crisis in the May timeframe, and commenced rent negotiations with landlords or stopped

paying rent all together to conserve cash.

38.     In addition to these efforts, Management took swift, responsive action across all

levels of the business to help the Debtors manage the impacts of the pandemic, including:

- temporarily closing as many as eighty-five (85) Rubio's locations, where an off-premises-only model was not feasible due to government mandates and/or lower customer demand;

- permanently closing twelve (12) stores in two (2) under-performing markets (Colorado and Florida) to eliminate unsustainable operating losses, optimize distribution costs and better focus field operations efforts;

- permanently closing fourteen (14) stores in the Debtors' core markets that were underperforming or were not anticipated to be viable in the long term;

- reducing store hours and reshuffling employee work schedules in order to appropriately match service capacity with demand;

- cutting pay by up to 30% for corporate Restaurant Support Center ("RSC") personnel and field management from late March through early July;

- implementing furloughs of approximately 45% of RSC and field management and over 1,400 restaurant employees;[22]

- recognizing certain employees for exemplary efforts and instituting incentive awards;

- monitoring demand closely and coordinating the delivery of perishable ingredients and other supplies between locations to avoid waste and decrease costs;

---

[22] The Debtors instituted a furlough program, pursuant to which furloughed employees remain on unpaid leave unless otherwise scheduled to work but remain eligible to participate in any health benefits programs in which they are currently enrolled. As government mandates have been lifted and restaurants reopened, many of these employees have rejoined active status with the Debtors. As of October 8, 2020, 104 employees were still on furlough. By retaining the furloughed staff, the Debtors expect to avoid significant additional costs related to recruiting, hiring, and training new personnel to deliver on the Debtors' reputation for exceptional customer service and employee satisfaction while managing to changing government guidelines, new safety protocols and other operational adjustments.

- expanding take-out and delivery services (including company-executed and third party services) even further;[23]

- maximizing the use of outdoor patio space for on-premises outdoor dining;[24]

- moving to canned beverages to support takeout and delivery to maintain beverage sales as much as possible;

- adding taco and burrito family kits to boost dinner sales;

- implementing aggressive strategic discounting campaigns to maintain market share;

- adopting and maintaining a pricing approach that features price competitive menu items for value seeking customers as well as higher-priced offerings for less price sensitive customers.

- freezing capital expenditure projects; and

- negotiating new agreements with various vendors and landlords to reflect the change in market conditions.[25]

### E.    ANALYSIS OF STORE LOCATIONS AND LEASES

39.    On May 29, 2020, the Debtors engaged B.  Riley Real Estate to perform, together with Mackinac Partners, an analysis of the Debtors' store base to identify locations that either (i)

---

[23]  Building on existing strengths in food delivery, with their own web and mobile based dispatch and delivery platform and relationships with third party partners, the Debtors began offering "contactless" delivery through these platforms. The Debtors' prior investment in these critical digital technologies and the diversity of avenues available for customers to order food have provided the Debtors with a clear advantage compared to their competitors as stay-at-home orders have become more common in the wake of the COVID-19 pandemic.  As discussed above, the Debtors subsidize administrative and delivery fees to reduce the cost of delivery for their customers.  Since the pandemic, the Debtors have further subsidized these costs to provide reduced-cost or free delivery to customers in line with competitors. More recently, the Debtors have begun renegotiating certain terms with their delivery partners and are moving towards a more normalized delivery cost model.

[24]  With indoor-dining shut down in many of the Debtors' key markets, the Debtors leaned heavily on their existing patios as a dining option for customers. The Debtors have ninety (90) locations with patios, which includes approximately 75% of locations where indoor-dining is currently prohibited.  Given the temperate climates in the areas of California, Arizona and Nevada where most Rubio's are located, the patios have afforded guests a highly attractive dining option. The Debtors enjoy a competitive advantage in that outdoor dining can be offered almost year-round in all markets other than Northern California. Every location with space that could be made available for additional patio seating has converted that space accordingly.

[25]  In an effort to preserve cash during this uncertain time, the Debtors generally did not pay rent for approximately three months after the onset of the COVID-19 pandemic and continued to negotiate deferrals thereafter.  After that time, the Debtors negotiated specific arrangements with each landlord to address their ongoing obligations and entered into deferral agreements with approximately 60 landlords, resulting in deferred rent of approximately $7.2 million as of the Petition Date.

should remain open, (ii) should be closed or (iii) may remain open if negotiations with landlords to reduce rent costs are successful.[26]  Upon conclusion of the analysis, B. Riley developed a plan to re-negotiate terms of various existing leases in the Debtors' three remaining markets upon the commencement of these Chapter 11 Cases.  As discussed above, the Debtors permanently closed twenty-six (26) stores based on unsustainable operating losses and/or other significant challenges. The Debtors have identified a number of other stores with unsustainable profitability levels that they believe can remain open only if the properties' landlords agree to satisfactory concessions. The degree of success of landlord negotiations will determine whether additional closures are necessary.

### F.       RECOGNIZING AND REWARDING EMPLOYEES

40.     Management demonstrated staunch resolve and leadership over the course of the past eight months—particularly in early March and April—which permeated the organization.

41.     On July 31, 2020, in recognition of the increased risk and additional demands placed on team members working at the Debtors' restaurant locations through the height of the COVID-19 pandemic, the Debtors provided recognition awards to 206 store managers and seventeen (17) other restaurant employees across the organization (the "Store Manager Recipients"), in the aggregate amount of $202,500.  Certain of the Store Manager Recipients are also eligible for KERP Bonuses (defined and discussed below).

42.     On August 13, 2020, in recognition of Management's exemplary efforts during this uncertain time period for the Debtors, the Debtors' board of directors approved a compensation

---

[26]   The Debtors' assessment of each location considered a host of factors, including: (i) historical operating and financial performance, (ii)  the physical environment in which the location operates (mall, in-line, stand-alone), such as the type, strength and drawing power of other formats, (iii) the competitive environment, (iv) the strength of the location and regional oversight leadership (v) the degree to which new balance of prospective pickup, delivery and dispatch and in-location dining for those locations would fit with the location's historical strengths and (vi) the market within which the location operates.

plan (the "Compensation Plan") for twenty-four (24) key employees (each individually, a "Compensation Plan Participant" and collectively, the "Compensation Plan Participants") pursuant to which an aggregate amount of $581,000 was awarded to the Compensation Plan Participants on August 24, 2020, with each such award contingent on the participant agreeing to return the full awarded amount (net of any taxes required to be paid by the participant in respect thereof and determined by taking into account any tax benefit that may be available to the participant in respect of such repayment) in the event that the participant's employment with the Debtors is terminated for any reason other than for certain exceptions, prior to December 31, 2020 or, in the case of certain participants who were made aware of the need for a bankruptcy filing, emergence from chapter 11 pursuant to a confirmed plan of reorganization.    The Compensation Plan also contemplates (i) an additional amount to be awarded in postpetition incentive-based awards (the "KEIP Bonuses") for ten (10) of the Compensation Plan Participants and (ii) an additional amount in postpetition retention-based awards (the "KERP Bonuses") for the remaining fourteen (14) Compensation Plan Participants.  In addition, the Debtors anticipate awarding KERP Bonuses to six additional employees who are not participants in the Compensation Plan.  The Debtors intend to file a motion for approval of the postpetition KEIP Bonuses and KERP Bonuses at a later date, which will provide greater detail on the bonus structure and metrics.

43.    The Debtors also put in place a separate incentive program for field managers (the "Employee Recipients") who perform in the top-quartile of certain guest satisfaction metrics (the "Field Management Bonus Plan"). Specifically, unit-level managers are eligible to receive payments under the Field Management Bonus Plan based on performing in the top quartile for

guest satisfaction metrics from several sources.[27]  The first payment under the Field Management

Bonus Plan was on October 23, 2020 for performance in the month of September.

### G.    ENGAGEMENT WITH GOLUB AND THE INVESTOR

44.    In April 2020, when the Debtors sought to obtain the PPP Loan, Golub, the

Prepetition Agent under the Debtors' Prepetition Credit Agreement, consented to this course of

action.  Then, following the delivery in June 2020 by Golub of a notice of defaults under the

Prepetition Credit Agreement, the Debtors, with the assistance of their advisors, entered into

discussions with Golub to negotiate debt relief in respect of the Prepetition Credit Agreement.  The

Debtors also commenced negotiations with Golub and the Investor on the terms of a broader

restructuring.  From the outset of these discussions, all parties acknowledged that the Debtors'

balance sheet and lease footprint were unmanageable given the current operating environment and

impact on sales.  The Debtors' efforts—including seeking landlord concessions, stopping rent

payments to conserve cash, applying for and receiving the PPP Loan, withdrawing from Colorado

and Florida markets and closing additional restaurants with unsustainable cost structures—were

insufficient to stabilize the business.  As negotiations progressed, the Debtors continued to burn

through cash, and the parties began to prepare for a chapter 11 filing.  The Debtors and their

advisors analyzed, among other things, the potential demands on available liquidity and the

financing necessary to sufficiently capitalize the Debtors.  Based on this analysis, the Debtors and

their advisors concluded that the Debtors would require access to new money debtor in possession

financing to support their operations and to maintain sufficient liquidity for the duration of these

Chapter 11 Cases.

---

[27]    Guest satisfaction metrics include OSAT score (weighted 40% of total bonus), guest complaint score (weighted 30% of total bonus), and third party/digital score (based on a five-star scale, weighted 30% of total bonus).

45.     In September, Golub initiated a $6.5 million cash sweep of the Debtors' main cash concentration account, which would have deprived the Debtors of much needed cash for the month of October.  In response, and to preserve the cash necessary to bridge to a restructuring, the Debtors negotiated a paydown of the Revolving Credit Facility in the amount of approximately $4.6 million (exclusive of related fees), which the Debtors believed would provide sufficient liquidity to conclude negotiations regarding the Prepackaged Plan that the Debtors now seek to implement through these Chapter 11 Cases.  Meanwhile, the Debtors and Golub began iterating on summary terms of a debtor in possession facility to be provided by the Prepetition Secured Lenders.  As described more fully in the *Declaration of Martin F. Lewis in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to: (A) Use Cash Collateral Pending a Final Hearing; (B) Incur Postpetition Debt on an Emergency Basis Pending a Final Hearing; and (C) Grant Adequate Protection and Provide Security and Other Relief to Golub Capital Markets LLC, as Agent, and the Lenders* (the "Lewis Declaration") the Debtors, with the assistance of their advisors, ran a parallel marketing process for third-party debtor in possession financing with a select number of private creditor investors that generally provide loans of the size and type needed by the Debtors, but that process failed to produce any alternate proposals.

46.     The Debtors' negotiations with Golub ultimately led to an agreement on the terms of debtor in possession financing (the "Postpetition Financing") to be provided by the Prepetition Secured Lenders (in such capacity, the "Postpetition Lenders") in the form of that certain Super-Priority Senior Secured Debtor in Possession Credit Agreement substantially in the form attached as **Exhibit B** to the Financing Motion (as defined herein) (and as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Postpetition Loan Agreement", the loans thereunder, the "Term A DIP

Loans"). Pursuant to the Postpetition Loan Agreement, the Postpetition Lenders have agreed to provide $8.0 million in aggregate term loan commitments (the "Term A DIP Loan Commitments"), provided, however, that the aggregate amount of the Term A DIP Loans made to the Debtors on the date of entry of an interim order approving the Postpetition Financing (the "Interim Order") shall not exceed $4.5 million, and the aggregate amount of Term A DIP Loans made available to the Debtors and funded after entry of a final order approving the Postpetition Financing shall not exceed $3.5 million. Simultaneously, Golub and the Investor negotiated the terms of an equity investment by the Investor and additional financing from Golub, as part of the Prepackaged Plan, that would provide fresh liquidity to the reorganized Debtors after emergence from chapter 11.

47.    Implementation of the transactions contemplated under the Postpetition Financing and the Prepackaged Plan, described more fully in the Financing Motion and the Disclosure Statement, each filed concurrently herewith, will position the Debtors for long-term success, save thousands of jobs, and ensure that the Debtors' key landlords and vendors continue to have a viable go-forward business partner.

## IV.    POSTPETITION FINANCING AND THE PREPACKAGED PLAN[28]

### A.    TERMS OF THE POSTPETITION FINANCING

48.    The Postpetition Financing and use of Cash Collateral will, among other things, permit the Debtors to continue to fund their operations during the pendency of these Chapter 11 Cases, and ensure that the Debtors will have sufficient liquidity to successfully operate their business upon emergence.

---

[28]    Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to them in the Prepackaged Plan or the Financing Motion, as applicable.

27242754.1

49.     The Postpetition Financing provides for the following key terms:

### 1.     Collateral

50.     The Term A DIP Loans will be secured by the same collateral as secures the Prepetition Credit Facility plus substantially all other property of the Debtors' estates, with first priority priming liens on all real and personal property of the estates of each the Debtors, and junior liens on collateral that is subject to Permitted Priority Liens (as defined in the Postpetition Loan Agreement), in each case, subject to the Carve Out (as defined in the Financing Orders).

### 2.     Covenants

51.     The Postpetition Loan Agreement includes certain affirmative and negative covenants and events of default consistent with the Existing Credit Agreement, and such other covenants and events of default that are usual and customary for debtor in possession financings of this type.  The Postpetition Loan Agreement also requires compliance with the Budget, subject to certain permitted variances.

### 3.     Interest and Fees

52.     Under the Postpetition Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the Postpetition Agent and the Postpetition Lenders. Specifically, the Debtors have agreed to an interest rate of LIBOR (with a floor of 1.25%) plus 7.50% per annum (or if applicable, Index Rate plus 6.25% per annum), including an incremental paid-in-kind (PIK) interest at a rate of 4.00% per annum, and, upon the occurrence and during the continuation of an Event of Default (as defined in the Postpetition Loan Agreement), interest at the applicable rate plus a rate equal to 2.00% per annum, increasing to 4.00% per annum on and after December 31, 2020.  In addition, the Debtors have agreed to pay to the Postpetition Agent a closing fee in an amount equal to $90,000, (the "Closing Fee"), which shall be fully earned and payable upon entry of the Interim Order.

27242754.1

### 4. Milestones

53. The Postpetition Loan Agreement establishes the following milestones, which may be waived or extended by the consent of the Prepetition Agent and Postpetition Agent:

| Event | Due Date |
|---|---|
| Entry of a Final Order Approving the Postpetition Financing | November 20, 2020 |
| Entry of Order Granting the Disclosure Statement Motion and Confirming the Prepackaged Plan | December 28, 2020 |
| Occurrence of the Effective Date of the Prepackaged Plan | December 31, 2020 |

## B. NEED FOR POSTPETITION FINANCING

54. The Debtors are in need of an immediate infusion of liquidity to ensure sufficient working capital to operate their business and administer their estates. The necessary payments include payments to employees, third party vendors, landlords, utilities, taxing authorities, and insurance companies, among others, who provide the essential services needed to operate, maintain, and insure the Debtors' assets. The Debtors' advisors have also determined that the Postpetition Financing is necessary to provide a positive message to the market that these Chapter 11 Cases are sufficiently funded, which is critical to address any concerns raised by the Debtors' customers, employees, landlords and vendors. Thus, immediate access to the Postpetition Financing and the continued use of Cash Collateral is crucial to the Debtors' efforts to preserve value for their stakeholders during these Chapter 11 Cases.

55. Access to the Postpetition Financing will provide the Debtors with capital that is essential to (a) operate throughout these Chapter 11 Cases; (b) avoid irreparable harm to the Debtors' estates; and (c) provide the Debtors with sufficient runway to pursue a reorganization. In anticipation of the immediate need for the Postpetition Financing and the continued use of Cash Collateral, Management, with the assistance of Mackinac, prepared the Budget (as defined in the

27242754.1

Postpetition Loan Agreement) which process I oversaw. I am familiar with the Budget and its contents. I believe the Budget is fair, reasonable, and appropriate under the circumstances. The Budget contemplates that the Debtors will need to obtain approximately $4.5 million in new financing between the Petition Date and the date the Interim Order must be entered under the terms of the Postpetition Loan Agreement.

56.     The Debtors, with the assistance of their advisors, including Mackinac, have determined that the Postpetition Financing should be sufficient to support the Debtors' operations through the pendency of these Chapter 11 Cases and should be adequate, considering all available assets, to pay administrative expenses due or accruing during the period covered by the Budget. Additionally, the Postpetition Financing will provide the Debtors with continued access to Cash Collateral, which relieves the Debtors of the cost of borrowing additional amounts to replace that cash. The Postpetition Financing is also critical to the broader restructuring transaction contemplated by the Prepackaged Plan, which is supported by Golub and the Investor pursuant to a prepetition restructuring support agreement (to which the Debtors are not a party). I believe the Postpetition Documents (as defined in the Motion) are a reflection of good faith, arms'-length, vigorous negotiation among the Debtors and Golub. Without access to the Postpetition Financing and the continued use of Cash Collateral, the Debtors would suffer immediate and irreparable harm, and the Debtors would be forced to liquidate. I believe that the use of Cash Collateral alone would be insufficient to meet the Debtors' postpetition liquidity needs.

C.      **THE POSTPETITION FINANCING IS THE BEST FINANCING AVAILABLE**

57.     As described more fully in the Lewis Declaration, the Debtors have been unable to obtain unsecured credit allowable as an administrative expense. The Debtors have also been unable to obtain credit: (a) having priority over that of administrative expenses; (b) secured by a

lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  I do not believe that the Debtors would be able to obtain financing on an unsecured basis pursuant to sections 364(b) and 503(1) of the Bankruptcy Code, or even on a superiority basis under section 364(c)(1) of the Bankruptcy Code, on terms more favorable than those of the Postpetition Financing.  Moreover, the proposed Postpetition Financing serves as an important component of the Debtors' overall restructuring efforts because it provides the Debtors with the stability and certainty that they can emerge from the chapter 11 process in a timely and expeditious manner.

58.     After an extensive review process, the transactions contemplated under the Prepackaged Plan and the Postpetition Financing comprise the only viable path forward that results in the Debtors continuing as a going concern.  For these reasons and the other reasons described in this Declaration, I believe that the Prepackaged Plan and entry into the Postpetition Financing represent a value-maximizing path forward for the Debtors.

### D.     TERMS OF THE PREPACKAGED PLAN[29]

59.     The Prepackaged Plan implements a prepackaged restructuring agreed to among the Debtors and the Debtors' major stakeholders, including Golub and the Investor.   The restructuring will result in a significant deleveraging of the Debtors' capital structure, as reflected in the following chart:

---

[29]   Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement, filed concurrently herewith.

| Capital Structure as of October 23, 2020 | |
| --- | --- |
| Instrument | Principal Outstanding |
| Revolving Facility | $4,049,615 |
| Term Loan Facility | $68,236,500 |
| PPP Loan | $10,000,000 |
| **Total** | **$82,313,115** |

| Structure Post-Emergence | |
| --- | --- |
| Instrument | Principal Outstanding |
| Exit Facility | $52,000,000 [30] |
| Investor Investment | $6,000,000 |
| Reorganized Equity Interests | $18,000,000 |
| **Total** | **$76,000,000** |

The anticipated benefits of the Prepackaged Plan include, without limitation, the following:

- Conversion of approximately $55.0 million of Secured Loan Claims[31] to equity and an exit facility (the "Exit Facility");

- Treatment of approximately $18.0 million of Secured Lender Deficiency Claims[32] as General Unsecured Claims under the Prepackaged Plan;

- The Postpetition Financing; and

- Prompt emergence from chapter 11.

60.     The Prepackaged Plan provides for a comprehensive restructuring of the Debtors' prepetition obligations, preserves the going-concern value of the Debtors' business, maximizes all creditor recoveries, and protects the jobs of the Debtors' invaluable employees, including Management.  As described in further detail below and in the Disclosure Statement, under the under the terms of the Prepackaged Plan, among other things, each holder of claims under the Prepetition Credit Facility will receive, on account of such claims, a Pro-Rata Share of (A) a portion of the Exit Facility (after accounting for the Exit Conversion Amount) in principal amount equal to $37.0 million and (B) the Reorganized Equity Interests.

---

[30]     This amount includes: (i) $37.0 million in accordance with treatment of Class 3 Secured Loan Claims under the Prepackaged Plan; (ii) $8.0 million in DIP Claims to be converted on a dollar-for-dollar basis into loans under the Exit Facility; and (iii) an additional $7.0 million in available liquidity.

[31]     "*Secured Loan Claims*" means any and all Loan Claims (as defined in the Prepackaged Plan) against any Debtor related to the Prepetition Credit Agreement that is a Secured Claim (as defined in the Prepackaged Plan).

[32]     "*Secured Lender Deficiency Claims*" means the Claims (as defined in the Prepackaged Plan) for any remaining prepetition obligations arising under the Prepetition Credit Agreement after taking into account the Secured Loan Claims.

61.     The Prepackaged Plan provides for the treatment of Claims against and Equity Interests in the Debtors through, among other things, the following:

- Each Holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the unpaid portion of such Allowed Administrative Claim;

- Each Holder of an Allowed Priority Tax Claim will be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code;

- Each Holder of an Allowed Other Priority Claim, in full and final satisfaction, settlement, release, and discharge and in exchange for each Other Priority Claim, shall (i) be paid in full in Cash, or (ii) receive such other recovery as is necessary to satisfy section 1129 of the Bankruptcy Code;

- On the Effective Date, all DIP Claims shall convert on a dollar-for-dollar basis into loans under, or otherwise paid or satisfied by, the Exit Facility pursuant to the Exit Facility Documents in an amount equal to the Exit Conversion Amount;

- Each Holder of an Other Secured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim: (i) payment in full in Cash; (ii) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) Reinstatement of such Claim; or (iv) other treatment rendering such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code;

- Each Holder of an Allowed Secured Loan Claim in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Secured Loan Claim, shall receive its Pro-Rata Share of: (A) a portion of the Exit Facility (after accounting for the Exit Conversion Amount) in a principal amount equal to $37.0 million and (B) the Reorganized Equity Interests;

- All PPP Loan Claims, for which the Debtors have requested 100% loan forgiveness pursuant to applicable Law, shall be treated as General Unsecured Claims to the extent not forgiven;

- All General Unsecured Claims shall be discharged and will receive no distribution on account of such Claims;

- Each Intercompany Claim shall, at the option of the Debtors and the Consenting Secured Lenders be (i) Reinstated or (ii) cancelled, released and discharged without any distribution on account of such Claims;

- All Subordinated Claims shall be cancelled, released, and discharged as of the Effective Date, and shall be of no further force or effect;

27242754.1

- All Equity Interests in Holdings shall be cancelled, released and discharged without any distribution on account of such Equity Interests; and

- The Intercompany Equity Interests shall be cancelled, released and discharged without any distribution on account of such Intercompany Equity Interests; *provided, however,* that at the option of the Debtors and the Consenting Secured Lenders, the Intercompany Equity Interests may be Reinstated for administrative convenience.

62.     The Prepackaged Plan also contemplates that the Debtors will seek to reject certain of their executory contracts and leases, including store leases for which the Debtors are unable to achieve sufficient landlord concessions over the course of these Chapter 11 Cases.  The Debtors, together with B.  Riley Real Estate and Mackinac, are continuing to evaluate their store leases as they consider which locations and markets to include in their portfolio upon emergence from chapter 11.

## V.     FIRST DAY MOTIONS AND RELATED RELIEF REQUESTED

63.     Concurrently with the filing of the Petitions, the Debtors filed the below-listed First Day Motions requesting relief that the Debtors believe is necessary to enable them to administer their estates with minimal disruption and loss of value during these Chapter 11 Cases.  The facts set forth in each of the First Day Motions are incorporated herein in their entirety.

### A.     ADMINISTRATIVE MOTIONS

- Creditor Matrix Motion. *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated (A) Creditor Matrix and (B) Top 30 Creditors List; (II) Authorizing Redaction of Certain Personal Identification Information; and (III) Granting Related Relief;*

- Joint Administration Motion.  *Debtors' Motion for Entry of Order Directing Joint Administration of Related Chapter 11 Cases; and Granting Related Relief;*

- Stretto 156(c) Retention Application. *Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of Stretto as Claims and Noticing Agent; and (II) Granting Related Relief;*

**B.      OPERATIONAL MOTIONS REQUIRING IMMEDIATE RELIEF**

- Cash Management Motion. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Intercompany Transactions; and (II) Granting Related Relief;*

- Customer Programs Motion. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Honor Certain Prepetition Obligations to Customers and (B) Otherwise Continue Certain Customer Programs in the Ordinary Course of Business; and (II) Granting Related Relief;*

- Financing Motion. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to: (A) Use Cash Collateral Pending a Final Hearing; (B) Incur Postpetition Debt on an Emergency Basis Pending a Final Hearing; and (C) Grant Adequate Protection and Provide Security and Other Relief to Golub Capital Markets LLC, as Agent, and the Lenders;*

- Taxes Motion. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees; and (II) Granting Related Relief;*

- Utilities Motion. *Debtors' Motion for Entry of Interim and Final Orders (I) (A) Approving the Debtors' Proposed Form of Adequate Assurance of Payment for Future Utility Services, (B) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (C) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Services; and (II) Granting Related Relief;*

- Wages Motion. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Employee Benefits Obligations and Other Compensation, (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations; and (II) Granting Related Relief;*

**C.      PAYMENT OF CLAIMS MOTIONS**

- Critical Vendor Motion. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors, Section 503(b)(9) Claimants, and PACA/PASA Claimants; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests; and (III) Granting Related Relief.*

64.     The First Day Motions request authority to, among other things, enter into the Postpetition Financing, honor workforce-related compensation and benefits obligations, pay claims of certain critical vendors, suppliers, and taxing authorities, continue to honor certain customer programs, and continue the Debtors' cash management system and other operations in the ordinary course of business to ensure minimal disruption of the Debtors' business operations during these Chapter 11 Cases.  For the avoidance of doubt, the Debtors request authority, but not direction, to incur indebtedness, pay amounts or satisfy obligations with respect to the relief requested in the First Day Motions.

65.     The Debtors have tailored their requests for immediate relief to those circumstances when the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates.  I believe an orderly transition into chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief described below could hinder the Debtors' operations and cause irreparable harm.  Other requests for relief will be deferred for consideration at a later hearing.

66.     I have reviewed each of the First Day Motions and am familiar with the content and substance contained therein.  The facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on other corporate officers and advisors and I can attest to such facts.  I believe that the relief requested in each of the First Day Motions listed above (a) is necessary to allow the Debtors to operate with minimal disruption and productivity losses during these Chapter 11 Cases, (b) is critical to ensure the maximization of value of the Debtors' estates through preserving customer, supplier and other partner relationships, among other things, (c) is essential to achieving a successful reorganization and ultimately emerging as a sustainable enterprise, and (d) serves the best interests of the Debtors' stakeholders.

## **CONCLUSION**

67.     The Debtors' ultimate goal in these Chapter 11 Cases is to achieve an orderly, efficient, consensual and successful reorganization to maximize the value of the Debtors' estates for their stakeholders.  To minimize any loss of value, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the course of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful reorganization of the Debtors' businesses will be substantially enhanced.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.


Dated: October 26, 2020                 */s/ Melissa Kibler*_____
Hinsdale, IL                            Name: Melissa Kibler
                                        Title: Chief Restructuring Officer
                                        Rubio's Restaurants, Inc.

27242754.1