**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>RUBIO'S RESTAURANTS, INC., *et al*.,<br><br>Debtors. [1] | Chapter 11<br><br>Case No. 20-12688 (___)<br><br>(Joint Administration Requested) |

**DECLARATION OF MARTIN F. LEWIS IN SUPPORT
OF THE DEBTORS' MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS AUTHORIZING THE DEBTORS TO: (A) USE CASH
COLLATERAL PENDING A FINAL HEARING; (B) INCUR POSTPETITION
DEBT ON AN EMERGENCY BASIS PENDING A FINAL HEARING; AND
(C) GRANT ADEQUATE PROTECTION AND PROVIDE SECURITY AND OTHER
RELIEF TO GOLUB CAPITAL MARKETS LLC, AS AGENT, AND THE LENDERS**

Pursuant to 28 U.S.C. § 1746, I, Martin F. Lewis, hereby declare as follows:

1. I am over the age of 18 and competent to testify, and am authorized to submit this declaration (this "Declaration") on behalf of the Debtors (defined below).[2]

2. I am the founder of Gower Advisers ("Gower"), the proposed investment banker to Rubio's Restaurants, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (these "Chapter 11 Cases").

3. Gower is the vehicle through which I, along with a small team of experienced restructuring professionals, provide corporate finance, restructuring advice and capital raising assistance to companies, creditors and purchasers of distressed assets, and provide broad senior

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Rubio's Restaurants, Inc. (0303); MRRC Hold Co. (1242); Rubio's Restaurants of Nevada, Inc. (7609); and Rubio's Incentives, LLC. (9359). The Debtors' mailing address is 2200 Faraday Avenue, Suite 250, Carlsbad, CA 92008.

[2] Capitalized terms used but not otherwise defined herein shall have their respective meanings ascribed to them in the Motion (as defined herein) or in the *Proposed Order Authorizing the Debtors to: (A) Use Cash Collateral Pending a Final Hearing; (B) Incur Postpetition Debt on an Emergency Basis Pending a Final Hearing; and (C) Grant Adequate Protection and Provide Security and Other Relief to Golub Capital Markets LLC, as Agent, and the Lenders,* attached to the Motion as **Exhibit A**.

level assistance in restructuring situations, including valuation and financing expert testimony. Prior to founding Gower, I was Managing Director in the Restructuring and Debt Advisory group at Greenhill & Co. Previously, I was a founding member of Miller Buckfire Lewis & Co., LLC (now known as Miller Buckfire), formed in 2001 with Henry Miller and Ken Buckfire as successor to the restructuring group of Wasserstein Perella ("Wasserstein"), which I had joined as a Managing Director in March 1998. Before that, I was at the Blackstone Group for seven (7) years where I was involved in a wide range of restructuring assignments as adviser to both companies and creditor groups. Prior to my activities as a restructuring specialist, I spent eight (8) at Chemical Bank, initially with Chemical Bank's investment bank in London and then New York, working primarily on European capital market, leveraged lending and investment banking transactions, before joining Chemical's restructuring and reorganization practice. Before that, I was at N.M. Rothschild in London and Mexico City, in the international corporate finance department. I graduated with an M.A. degree from Oxford University and am qualified as a Chartered Accountant in the U.K. Collectively, I have 40 years of investment banking experience, with particular emphasis in the last 30 years on restructuring and recapitalization advice.

4.     Prior to founding Gower, I was involved in a number of notable chapter 11 cases, including New Page Corp, General Growth Properties, Fleetwood Enterprises, Burlington Industries, Acme Metals, The Loewen Group, Carmike Theaters, Laidlaw, Polymer Group, Drypers and Barneys, testifying in this and other jurisdictions on a variety of matters including financing, valuation, sale and plan related motions. Since founding Gower, I have worked on a broad range of restructuring and reorganization assignments for companies, creditor groups, and acquirers of distressed assets, including involvement in the chapter 11 cases of PHI Inc., David's

Bridal, C&J Energy Services, and Breitburn Energy Partners, where I testified in this and other jurisdictions on a variety of chapter 11 matters including valuation.

5. On May 8, 2020, the Debtors engaged Gower to act as the Debtors' exclusive investment banker in connection with, among other things, (a) a review of the Debtors' business, operations, and financial projections, (b) an analysis of the Debtors' capital structure, debt capacity, and potential valuation, and (c) consideration of, and negotiations to implement, strategic alternatives to address the Debtors' capital structure and go-forward alternatives. Under my supervision, the Gower team has worked closely with the Debtors' management team ("Management") in concert with the other advisors retained by the Debtors in connection with preparing for these Chapter 11 Cases. I have become well acquainted with the Debtors' capital structure, liquidity needs, and business operations.

6. I submit this Declaration in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to: (A) Use Cash Collateral Pending a Final Hearing; (B) Incur Postpetition Debt on an Emergency Basis Pending a Final Hearing; and (C) Grant Adequate Protection and Provide Security and Other Relief to Golub Capital Markets LLC, as Agent, and the Lenders* (the "Motion") and approval of the financing package proposed therein (the "Postpetition Financing", as described more fully below) pursuant to interim and final orders (the "Financing Orders").

7. Except as otherwise indicated, all facts or opinions set forth in this Declaration are based on my personal knowledge, my discussions with Management, and the Debtors' employees or advisors, boards of directors or managers, or other members of the Gower team, my review of relevant documents and information concerning the Debtors' financial affairs and restructuring initiatives, or my experience. I am not being specifically compensated for this testimony other

than through payments received by Gower as a professional whose retention the Debtors will seek pursuant to an application to be filed with this Court. If called upon to testify, I could and would testify competently to the statements set forth in this Declaration, as the information in this Declaration is accurate to the best of my knowledge.

## THE DEBTORS' EFFORTS TO OBTAIN POSTPETITION FINANCING

8. In my role as investment banker, I was actively involved in the Debtors' analysis of their options, including their financing options, and their efforts to obtain debtor-in-possession financing to fund these Chapter 11 Cases. Based on my experience and involvement in the consideration and good-faith, arms'-length negotiation of the Postpetition Financing (as defined below), the Postpetition Financing should be approved. The Postpetition Financing is the best financing package available to the Debtors under the circumstances.

**I.     NEGOTIATONS WITH GOLUB AND THE INVESTOR**

9. In June 2020, Rubio's received a notice of default and reservation of rights from the Prepetition Agent (defined below) under that certain Credit Agreement dated as of August 24, 2020 (the "Prepetition Credit Agreement") by and among Rubio's Restaurants, Inc., successor by merger to MRRC Merger Co., as borrower, the other Debtors, as guarantors, Golub Capital Markets LLC (f/k/a GCI Capital Markets LLC) ("Golub"), as administrative agent (the "Prepetition Agent"), and the lenders party thereto[3] (the "Prepetition Secured Lenders", together with the Prepetition Agent, the "Prepetition Secured Parties") related to certain "Events of Default" existing as of March 31, 2020 in connection with the delivery of Rubio's' first quarter compliance package. The Debtors, with the assistance of their advisors, approached Golub to negotiate debt relief in respect of the Prepetition Credit Agreement. The Debtors also commenced negotiations

---

[3] The Prepetition Secured Lenders are all Golub affiliates.

27242929.1

4

with Golub and Mill Road Capital Partners, L.P. (the "Investor") on the terms of a broader restructuring of the Debtors' balance sheet and restaurant footprint. As negotiations progressed, the Company continued to burn through cash and the parties began to prepare for a chapter 11 filing. As described more fully in the *Declaration of Melissa S. Kibler, Chief Restructuring Officer of the Debtors, in Support of (I) Chapter 11 Petitions, (II) First Day Motions and (II) Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to: (A) Use Cash Collateral Pending a Final Hearing; (B) Incur Postpetition Debt on an Emergency Basis Pending a Final Hearing; and (C) Grant Adequate Protection and Provide Security and Other Relief to Golub Capital Markets LLC, as Agent, and the Lenders* (the "First Day Declaration"), I, along with Management and the Debtors' other advisors analyzed, among other things, the potential demands on available liquidity and the financing necessary to sufficiently capitalize the Debtors, and we concluded that the Debtors would require access to new money debtor-in-possession financing to support their operations and to maintain sufficient liquidity for the duration of these Chapter 11 Cases.

10. In September, Golub initiated a $6.5 million cash sweep of the Debtors' main cash concentration account. In response, and to preserve the cash necessary to bridge to a restructuring, the Company negotiated a paydown of its revolving credit facility under the Prepetition Credit Agreement in the amount of approximately $4.6 million, which the Debtors believed would leave sufficient liquidity to conclude negotiations regarding the proposed prepackaged chapter 11 plan of reorganization (the "Prepackaged Plan") that the Company now seeks to implement through these Chapter 11 Cases. Meanwhile, the Debtors and Golub began iterating on summary terms of a debtor-in-possession facility to be provided by the Prepetition Secured Lenders. As detailed below, the Debtors ran a parallel marketing process for third-party debtor-in-possession financing

with a select number of private creditor investors that generally provide loans of the size and type needed by the Debtors.

## II. THE MARKETING PROCESS

11. In this case, obtaining access to debtor-in-possession financing was difficult because all or nearly all of the Debtors' assets are encumbered under the existing capital structure, which, along with the Debtors' uncertain financial condition, restricts the availability of, and options for, debtor-in-possession financing. To avoid a protracted and expensive priming fight, which the Debtors could not afford, the Debtors and their advisors believed that their only alternatives were to (a) obtain Golub's consent to the priming of its liens by a third-party lender, (b) locate a third-party lender willing to provide debtor-in-possession financing on an unsecured basis with priority over that of administrative expenses, (c) find lenders willing to refinance out Golub and provide incremental liquidity, or (d) find junior financing and a new secured lender. Indeed, based on a review of Golub's lien position and our preliminary analysis of the Debtors' potential enterprise value, the Debtors believed that there was not an equity cushion available for the Debtors to obtain debtor in possession financing based on priming Golub's liens over their objections, nor would the Debtors' business be able to sustain its value during a contested priming fight with Golub.

12. Given these constraints, all parties contacted were unwilling to provide actionable debtor in possession financing junior to Golub. Notwithstanding these considerations, the Debtors, with the assistance of Gower, solicited proposals for third-party debtor in possession financing in parallel with discussions with Golub. Beginning on October 18, 2020, the Debtors, with the assistance of Gower, reached out to several private credit investors that make credit investments in the amount required by the Debtors to gauge their interest in providing debtor-in-possession financing to the Debtors. Due to the Debtors' financial position, their existing leveraged capital

27242929.1

6

structure, and the small size of the financing need (which would not generate sufficient return on invested capital to compensate a third-party lender for participating in the financing), the Debtors were unable to identify any interested third-party financing parties. The size of the debtor-in-possession financing request alone did not meet many of the initial qualifications of larger third-party financing sources. Nor were potential financing parties willing to provide financing junior to Golub due to the amount of existing secured debt relative to the Debtors' financial position (Golub made clear it was not willing to subordinate its first lien position to a third party lender). In addition, any senior financing that did not include Golub's consent would have inevitably resulted in non-consensual priming fight, which had the potential to draw out these Chapter 11 Cases and result in increased professional costs, threatening the Debtors' ability to emerge as a viable reorganized entity. For the foregoing reasons, the Debtors determined that reaching out to any additional third party financing sources would be fruitless and unlikely to result in any financing proposals.

### III. THE POSTPETITION FINANCING

13. In parallel with the solicitation of proposals from new sources of financing, the Debtors and their advisors continued negotiating with Golub on the terms of a debtor-in-possession credit facility to be provided by one or more of the Debtors' prepetition secured lenders (all Golub affiliates). The Debtors' negotiations with Golub ultimately led to an agreement on the terms of debtor-in-possession financing (the "Postpetition Financing") to be provided by certain of the Prepetition Secured Lenders (in such capacity, the "Postpetition Lenders") in the form of that certain Super-Priority Senior Secured Debtor-in-Possession Credit Agreement substantially in the form attached as Exhibit B to the Motion (and as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Postpetition Loan Agreement", the loans thereunder, the "Term A DIP Loans"). Pursuant to the

Postpetition Loan Agreement, the Postpetition Lenders have agreed to provide $8.0 million in aggregate term loan commitments (the "Term A DIP Loan Commitments"), provided, however, that the aggregate amount of the Term A DIP Loans made to the Debtors on the date of entry of an interim order approving the Postpetition Financing shall not exceed $4.5 million and the aggregate amount of additional Term A DIP Loans made available to the Debtors and funded after entry of a final order approving the Postpetition Financing shall not exceed $3.5 million. Simultaneously, Golub and the Investor negotiated the terms of an equity investment by the Investor and additional exit financing from Golub, as part of the Prepackaged Plan, which would provide additional liquidity to the Reorganized Debtors after emergence from chapter 11. The Prepackaged Plan contemplates, among other things, the Debtors moving quickly and efficiently through these Chapter 11 Cases, equitizing a meaningful amount of prepetition indebtedness and emerging with a leaner footprint of store locations by year end. This comprehensive restructuring of the Debtors' prepetition obligations depends on, and would not be feasible without, the Postpetition Financing, which is only being provided in connection the Prepackaged Plan and the transactions contemplated thereunder.

**IV. THE POSTPETITION FINANCING HAS BEEN HEAVILY NEGOTIATED**

14. Management and the Debtors' legal and financial advisors were actively involved throughout the negotiations with Golub for debtor-in-possession financing, which were conducted vigorously, at arms' length and in good faith. Moreover, the Postpetition Financing is an integral part of the Prepackaged Plan and cannot not be viewed in isolation. First, Golub was unwilling to lend on terms other than those specifically set forth in the Postpetition Documents.[4] Second, Golub

---

[4] "Postpetition Documents" means (1) the Postpetition Loan Agreement, and (2) any other agreements, instruments, pledge agreements, mortgages, guarantees, security agreements, intellectual property security agreements, control agreements, notes and other Loan Documents (as defined in the Postpetition Loan Agreement) and documents

27242929.1

would not have allowed a third party to prime its liens or use its Cash Collateral while *also* agreeing to support the Prepackaged Plan.  Finally, the Postpetition Financing represents a negotiated resolution with Golub and the Investor, whereby the Debtors can obtain a substantial financing package on market terms, without overly burdensome case controls, without the risk of a priming fight, and with a clear path to expedited emergence through consummation of the Prepackaged Plan.

## V. THE TERMS OF THE POSTPETITION FINANCING ARE FAIR AND REASONABLE

15. Given the lack of interest from third-party lenders, the challenges specific to these Chapter 11 Cases and the immediate funding need in the interim period, I believe the Postpetition Financing provides the Debtors with fair, reasonable and the best available overall financing terms under the Debtors' circumstances.

16. Collateral.  The Term A DIP Loans will be secured by the same collateral as secures the obligations under the Prepetition Credit Agreement and substantially all of the other property and assets of the Debtors, with first priority priming liens on all real and personal property of the estates of each the Debtors, and junior liens on collateral that is subject to Permitted Priority Liens (as defined in the Postpetition Loan Agreement), in each case, subject to the Carve Out (as defined in the Financing Orders).  The Permitted Priority Liens include liens securing a principal amount equal to $55,000,000 of Prepetition Debt due to the Prepetition Agent or the Prepetition Lenders, and, in effect, this results in the Term A DIP Loan being subordinated to a significant portion of the Prepetition Debt.

---

related thereto (as each document may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and the Financing Orders).

27242929.1

17. <u>Covenants</u>.  The Postpetition Loan Agreement includes certain affirmative and negative covenants and events of default consistent with the Existing Credit Agreement, and such other covenants and events of default that are usual and customary for debtor-in-possession financings of this type.  The Postpetition Loan Agreement also requires compliance with the Budget (as defined therein), subject to certain permitted variances.

18. <u>Interest and Fees.</u> Under the Postpetition Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the Postpetition Agent and the Postpetition Lenders.  Specifically, the Debtors have agreed to an interest rate of LIBOR (with a floor of 1.25%) plus 7.50% per annum (or if applicable, Index Rate plus 6.25% per annum), plus incremental paid-in-kind (PIK) interest at a rate of 4.00% per annum, and, upon the occurrence and during the continuation of an Event of Default (as defined in the Postpetition Loan Agreement), interest at the applicable rate plus a rate equal to 2.00% per annum, increasing to 4.00% per annum on and after December 31, 2020.  In addition, the Debtors have agreed to pay to the Postpetition Agent a closing fee in an amount equal to $90,000, (the "<u>Closing Fee</u>") which shall be fully earned on the date of entry of an order of this Court approving the Motion on an interim basis (the "<u>Interim Order</u>") and payable upon entry of the Interim Order.

19. <u>Milestones.</u>  I understand that the Postpetition Financing also contemplates certain milestones as detailed in the First Day Declaration (the "<u>Milestones</u>") that the Debtors must meet throughout their Chapter 11 Cases.  Among other provisions of the Postpetition Loan Agreement, the Milestones were negotiated and required by Golub as a condition to providing the Postpetition Financing.  I believe that the Milestones should permit sufficient time for the Debtors to emerge given the prepackaged nature of these Chapter 11 Cases.

27242929.1

10

## THE POSTPETITION FINANCING IS THE BEST FINANCING AVAILABLE

20. Each of the collateral terms, covenants, interest rates, the Closing Fee and the Milestones were subject to negotiation, are integral components of the overall terms of the Postpetition Financing, and were required by Golub as consideration for the extension of the Term A DIP Loans. Particularly in light of the fact that the Postpetition Financing is being provided in connection with the terms of a broader restructuring as embodied in the Prepackaged Plan, the terms reflected in the Postpetition Loan Agreement are reasonable and substantially in line with other debtor-in-possession financings generally, including debtor-in-possession financings recently approved by this court and others in comparable Chapter 11 Cases.[5] Access to the Postpetition Financing will provide the Debtors with capital that is essential to (a) operate throughout these Chapter 11 Cases; (b) avoid irreparable harm to the Debtors' estates; and (c) provide the Debtors with sufficient runway to pursue a reorganization.

21. I believe the proposed Postpetition Financing serves as an important component of the Debtors' overall restructuring efforts because it provides the Debtors with the stability and certainty that they can emerge from the chapter 11 process in a timely and expeditious manner. Overall, based on the results of Gower's discussions with potential lenders, I believe that the Postpetition Financing is the best available possible financing option for the Debtors at this time.

## NEED FOR INTERIM RELIEF

22. The Debtors are entering these Chapter 11 Cases with the support of Golub and the Investor. Their support is contingent on, among other things, meeting the obligations in the Postpetition Documents and consummating the restructuring transactions contemplated under the Prepackaged Plan. One of the Debtors' principal obligations under the Postpetition Documents is

---

[5] *See* **Annex 1**, a comparison of recent restaurant debtor-in-possession financings, attached hereto.

27242929.1

11

to gain this Court's approval of the Postpetition Financing pursuant to the terms of the Interim Order within the first three (3) Business Days of these Chapter 11 Cases.

23. As described more fully in the First Day Declaration, the continued and viable operation of the Debtors' business through and upon emergence from chapter 11 will not be possible absent the Court's entry of the Interim Order. Approval of the Interim Order will ensure that the Debtors' can (a) continue their business operations without interruption, (b) maintain ordinary course relationships with vendors and customers, (c) continue to pay and honor obligations to their employees, (d) satisfy other working capital needs in the ordinary course, and (e) consummate the broader set of restructuring transactions as embodied in the terms of the Prepackaged Plan.

## **CONCLUSION**

24. In sum, based upon the foregoing and the facts and circumstances of these cases, I believe that approving the Postpetition Financing and use of Cash Collateral is in the best interests of the Debtors' estates.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated: October 26, 2020
      Millbrook, New York

*/s/ Martin F. Lewis*
Martin F. Lewis

# **Annex 1**

(Recent Restaurant Debtor-in-Possession Financings)



**Rubio's Coastal Grill**

# Comparison of Key Business Terms – Recent Restaurant DIP's

|  | Rubio's | CEC Entertainment | CPK Inc | Food First Global | Craftworks | American Blue Ribbon | BL Restaurant Group |
|---|---|---|---|---|---|---|---|
| Business | Rubio's Coastal | Chuck E Cheese | California Pizza Kitchen | Bravo, Brio | Logan's Roadhouse | Village Inn | Bar Louie |
| Motion Date | 10/26/20 | 4-Sep-20 | 30-Jul-20 | 13-Apr-20 | 3-Mar-20 | 27-Jan-20 | 27-Jan-20 |
| Final Approval |  | 13-Oct-20 | 23-Sep-20 | 7-Jul-20 | 3/5/20 Interim | 24-Feb-20 | 2-Mar-20 |
| Lender | Golub | Existing Lenders | Existing 1st lien lenders Jefferies as Agent | GPEE | Fortress (Existing 1st lien lender) | Cannae (equity owners) | Antares |
| Type | Term Loan | Term Loans | Term Loan | Term Loans | Revolving Credit | Revolving Credit | Revolving Credit |
| Size - New Money | $8MM | $200MM | $47MM new money | $10MM | $25MM new money | $20MM (later increased to $27MM) | $22MM |
| Outside Maturity [1] | 2 mths (12/31/20) | 6 mths | 5 mths | 75 days | 3 mths | 10 mths | 6 mths |
| Interest Rate | Libor + 11.5%, 7.50% cash pay, 4.00 % PIK Prime + 10.50%, 6.50% cash pay, 4% PIK | Libor + 10% Prime + 9% cash pay | Libor + 10% cash pay on new money | 15% Pik | Libor + 8.5% cash pay | Prime + 6% cash pay | Libor + 9% Prime + 8% cash pay |
| Libor floor | 1.25% | 1.00% | 1.50% | na | 1% | na | 1% |
| Upfront fees | $90K (= 1.125% on Commitment) | 5% on Commitments | 15% Commitment Fee (cash pay) + 6.25% Closing Fee | $300K origination fee 10% on commtiments | 2% on commitment | $200K | $50K arranger fee + 3% on new money |
| Variance covenant | ≯15% budget | ≯15% budget | ≯10% budget | ≯15% budget | ≯15% budget (20% for initial testing period) | ≯15% budget | ≯10% budget |

[1] All maturity dates generally defined as the earlier of the Outside Date shown, or the Effective Date of a Plan or Sale

**Gower Advisers LLC**

1